UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

UNITED STATES OF AMERICA        )
                                )
v.                              )        NO. 2:12-CR-105(01)
                                )
GREGORY ALLEN RHEA              )

## MEMORANDUM AND ORDER

This criminal case is presently before the Court on defendant's pro se motion to withdraw his guilty pleas, [Doc. 506], and counsel's supplemental motion to withdraw guilty pleas, [Doc. 531]. The government has responded in opposition, [Doc. 538]. The Court held a hearing on the motions on September 3, 2014, during which it heard oral argument and testimony from the defendant, his former attorneys, and defendant's sister. At the conclusion of the hearing, the Court took the matter under advisement. After careful consideration of the motions, responsive documents, testimony, exhibits, oral arguments of the parties, and the relevant law, defendant's motion to withdraw his guilty pleas, [Docs. 506, 531], will be DENIED.

## I.     Relevant Facts and Background

Gregory Allen Rhea, ("defendant" or "Rhea") was one of 12 defendants indicted by a federal grand jury on October 10, 2012, [Doc. 3]. Rhea was charged with (1) conspiracy to distribute oxycodone, (Count One); (2) distribution of oxycodone, (Counts Two, Three, Four, Five, Six, Seven, Eight, Nine, Ten); (3) possession with intent to distribute oxycodone, (Counts Eleven, Twelve); (4) using and maintaining a residence for the purpose of distributing oxycodone, (Count Thirteen); (5) money laundering, (Count Fourteen); (6) possession of firearms in furtherance of the drug trafficking offense charged in Count One, (Count Fifteen); (7)

possession of a firearm by an unlawful user and addict of a controlled substance, (Count Sixteen); (8) possession of a machinegun in furtherance of the drug trafficking offenses charged in Counts One and Thirteen, (Count Seventeen); and (9) conspiracy to distribute five grams or more of methamphetamine, (Count Eighteen). The indictment also contained forfeiture allegations, including a money judgment of at least $1,200,000.

A superseding indictment was returned on June 11, 2013, [Doc. 252]. The superseding indictment dropped some defendants who had already entered into plea agreements, re-charged Counts One through Eleven, and added a new Count Twelve (possession of firearms in furtherance of the drug trafficking offenses charged in Counts One and Eleven), re-numbered the original Counts Twelve, Thirteen and Fourteen as Thirteen, Fourteen and Fifteen, added a new Count Sixteen (possession of a machinegun in furtherance of the drug trafficking offenses charged in Counts One and Eleven), a new Count Seventeen (conspiracy to distribute 50 grams or more of methamphetamine), new Counts Eighteen and Nineteen (possession with intent to distribute oxycodone), and a new Count Twenty (possession of a firearm in furtherance of the drug trafficking offenses charged in Counts Eighteen and Nineteen).

After significant motion practice, Rhea signed a plea agreement on August 13, 2013, agreeing to plead guilty to Counts One, Thirteen, Fifteen and Eighteen (lesser included offense) of the original indictment, [Doc. 296]. An addendum to the plea agreement signed September 10, 2013, corrected the counts to correspond to Counts One, Twelve, Fourteen and Sixteen of the superseding indictment, [Doc. 316]. The plea agreement contained a lengthy stipulation of facts as follows:

> a)     Through the testimony of several witnesses, including law enforcement officers, the United States would demonstrate, beyond a reasonable doubt, that

beginning from approximately December 1, 2003, to December 14, 2004, and from approximately January 1, 2008, continuing to on or about October 10, 2012, in the Eastern District of Tennessee, and elsewhere, the defendant did knowingly and intentionally conspire with at least one other person to distribute oxycodone, a Schedule II controlled substance, and methamphetamine, a Schedule II controlled substance.

b)      During the time period of the conspiracy, the defendant admits that he entered into an agreement with co-defendants Gerald Allen Horner, Ryan Michael Guesford, Joey Wayne Vanover, Kara Leanne Greene, Ashley Nicole Gray Patterson, Johnny Wayne Neeley, Kerry Glenn Nelson, Kimberly Ann Vanover, Ricky Allen Seal, Tamara Michelle Moles, aka Tamara Michelle Parkey-Moles, and Ricky Tim Collins, and others to distribute oxycodone, a Schedule II controlled substance.  The defendants obtained oxycodone from numerous physicians in the Eastern District of Tennessee and in the state of Florida for the purpose of distributing oxycodone in the Eastern District of Tennessee.

c)      During the time period of the conspiracy, the defendant also admits that he entered into an agreement with co-defendants Gerald Horner, Kara Greene, Ashley Patterson, and others to distribute methamphetamine, a Schedule II controlled substance.  The defendants obtained methamphetamine from numerous sources in the Eastern District of Tennessee, in the state of Georgia, and in the state of Florida for use and distribution in the Eastern District of Tennessee.

d)      The defendant admits that he directed co-defendants Gerald Horner, Kara Greene, and Ashley Patterson to travel to the state of Georgia to acquire methamphetamine.  The defendant admits that he supplied United States currency to finance their travels to the state of Georgia for the purpose of obtaining methamphetamine.

e)      The defendant admits that he directed co-defendants Gerald Horner, Ryan Guesford, Joey Vanover, Kera Greene, Ashley Patterson, Johnny Neeley, Kerry Nelson, Kimberly Vanover, Tamara Moles, and others to travel to the state of Florida to acquire oxycodone from numerous physicians at various pain clinics.  The defendant admits that he supplied United States currency to finance their travels to the state of Florida, as well as transportation and airline tickets on occasion, for the purpose of obtaining oxycodone.

f)      The defendant admits that he traveled to the state of Florida with co-defendants Gerald Horner, Ryan Guesford, Joey Vanover, Kara Greene, Ashley Patterson, Johnny Neeley, Kerry Nelson, Kimberly Vanover, Tamara Moles, and others for the purpose of obtaining oxycodone, and that he, his co-defendants, and others transported oxycodone back from the state of Florida to the Eastern District of Tennessee for the purpose of distribution.

g)      The defendant further admits that he directed some of his co-defendants and others to travel to pain clinics located through the Eastern District of Tennessee to acquire oxycodone.  The defendant admits that he supplied

3

United States currency to finance trips to pain clinics in the Eastern District of Tennessee, as well as currency for the payment of medical and prescription bills, all for the purpose of obtaining oxycodone for distribution in the Eastern District of Tennessee.

h)       The defendant admits that he organized trips for other co-defendants to visit physicians at pain clinics in the Eastern District of Tennessee and in the state of Florida for the purpose of obtaining oxycodone to distribute in the Eastern District of Tennessee.  The defendant admits that he traveled to the state of Florida on at least fifteen (15) occasions for the purpose of obtaining oxycodone and other controlled substances from pain clinics to distribute in the Eastern District of Tennessee.

i)       The defendant admits that he recruited other individuals to make appointments with a certain physician at a pain clinic in Kingsport, Tennessee, for the purpose of obtaining additional oxycodone pills to distribute in the Eastern District of Tennessee.

j)       The defendant admits that he knew that the oxycodone he obtained from physicians in the Eastern District of Tennessee and the state of Florida was distributed in the Eastern District of Tennessee by himself, co-defendants, and others.

k)       The defendant admits that he knew that the methamphetamine he obtained from sources in the Eastern District of Tennessee and the state of Georgia was distributed in the Eastern District of Tennessee by himself, co-defendants, and others.

l)       The defendant admits that he directed some of his co-defendants to distribute oxycodone on his behalf in the Eastern District of Tennessee, and that he supplied oxycodone to his co-defendants for distribution.

m)       On October 10, 2008, 1.4 grams of methamphetamine and 305 dose units of thirty (30) milligram oxycodone were discovered at the defendant's residence in Rogersville, Tennessee, pursuant to a consent search.  The defendant admits that the 1.4 grams of methamphetamine and 305 dose units of oxycodone discovered at his residence belonged to him and that he intended to distribute both controlled substances.

n)       On March 27, 2011, the defendant was stopped at the McGhee-Tyson Airport in Alcoa, Tennessee, while en route to Florida.  The defendant was found to be in possession of $68,100 in United States currency, which was subsequently seized.  The defendant admits that the $68,100 seized on that date was the proceeds of his drug trafficking activities, specifically, the distribution of oxycodone and methamphetamine.  The defendant further admits that he was attempting to conceal and disguise the source of the $68,100, which were the proceeds of his drug trafficking activities, by attempting to enter into a real estate transaction in the state of Florida.

o)       The Morristown Police Department began investigating the drug trafficking activities of the defendant utilizing a confidential informant in 2011.  From July 29, 2011, to September 18, 2012, nine undercover drug

4

transactions occurred, all of which resulted in the purchase of oxycodone from the defendant and some of his co-defendants. As a result, the following undercover drug transactions occurred:

1. On July 29, 2011, the defendant admits that he sold ten (10) dose units of thirty (30) milligram oxycodone pills to a confidential informant in Morristown, Tennessee.

2. On August 13, 2011, the defendant admits that he sold ten (10) dose units of thirty (30) milligram oxycodone pills to a confidential informant at the defendant's residence, located at 412 Hayter Drive, Morristown, Tennessee. During this transaction, the defendant admits that he attempted to recruit the confidential informant to travel to a pain clinic in Bearden, Tennessee, for the purpose of obtaining oxycodone. The defendant further admits that he offered to "sponsor" the confidential informant to go to this pain clinic, which means that the defendant agreed to provide money for travel to the clinic and the payment of medical and prescription bills in exchange for half of the prescription pills obtained as a result of the pain clinic appointment. 3. On August 27, 2011, the defendant admits that he and co-defendant Joey Vanover sold ten (10) dose units of thirty (30) milligram oxycodone pills to a confidential informant at the defendant's residence, located at 412 Hayter Drive, Morristown, Tennessee.

4. On September 2, 2011, the defendant admits that he and co-defendants Ryan Guesford and Joey Vanover sold five (5) dose units of thirty (30) milligram oxycodone pills to a confidential informant at the defendant's residence, located at 412 Hayter Drive, Morristown, Tennessee.

5. On September 10, 2011, the defendant admits that he sold ten (10) dose units of thirty (30) milligram oxycodone pills to a confidential informant at the defendant's residence, located at 412 Hayter Drive, Morristown, Tennessee.

6. On October 11, 2011, the defendant admits that he and co-defendants Joey Vanover and Kimberly Vanover sold nine (9) dose units of thirty (30) milligram oxycodone pills to a confidential informant at the defendant's residence, located at 412 Hayter Drive, Morristown, Tennessee.

7. On November 23, 2011, the defendant admits that he sold twenty (20) dose units of fifteen (15) milligram oxycodone pills to a confidential informant at the defendant's residence, located at 412 Hayter Drive, Morristown, Tennessee.

8. On April 1, 2012, the defendant admits that he sold ten (10) dose units of thirty (30) milligram oxycodone pills to a confidential informant at the defendant's residence, located at 412 Hayter

5

> Drive, Morristown, Tennessee.
> 9.     On September 18, 2012, the defendant admits that he sold ten (10) dose units of thirty (30) milligram oxycodone pills to a confidential informant at the defendant's residence, located at 412 Hayter Drive, Morristown, Tennessee.

[Doc. 296, ¶ 14, pp. 3-10].

A change of plea hearing was conducted on September 10, 2013, [Doc. 312]. Before accepting the guilty plea, the Court engaged in a lengthy colloquy with defendant in accordance with Federal Rule of Criminal Procedure 11 in an attempt to ensure that he was knowingly and voluntarily pleading guilty. Rhea acknowledged that he understood that he could confer with his attorney at any time throughout the hearing or seek clarification of the Court as to any question, that he was under oath, and that he could be charged with another criminal offense if he lied under oath. Rhea stated that he had received and read the superseding indictment, had had ample opportunity to discuss the case with his lawyers, and had been advised as to the elements of the offenses by his attorneys. The Court read the relevant counts of the superseding indictment and went through the elements of each offense with the defendant. Rhea indicated that he understood what he was charged with in the relevant counts and understood the elements of each offense which had to be proven. He testified that his attorneys had discussed available defenses with him.

Rhea further testified that his attorneys had explained the terms and conditions of the plea agreement, that he had read and fully understood the terms and conditions of the agreement, had signed it, and was satisfied with his lawyers' representation of him. Rhea's attorney confirmed that he was satisfied that Rhea understood the charges, the elements of the offenses charged, and the legal meaning of all words used in the superseding indictment. Rhea testified that he

6

understood the rights he was waiving, including the right to a jury trial. He testified that no one had put any mental or physical pressure on him to force him to plead guilty and that no promises or threats had been made by anyone to induce him to plead guilty. Rhea acknowledged that he had read the factual stipulation, that he agreed with the summary of what he did in the case contained in the stipulation, and verified, under oath, that all of the facts in the stipulation were true. Rhea clearly and unequivocally pled guilty to each charge and acknowledged that he was in fact guilty of each one.

Rhea agreed that he understood the maximum and minimum sentences provided by statute for each count of conviction, that he understood that the plea agreement provided for forfeiture of firearms, cash, and his interest in real property located at 412 Hayter Drive, Morristown, that he understood that he would be responsible for a money judgment of $1,200,000, that he understood that he had waived appeal rights and § 2255 rights in the plea agreement, and that he understood that his sentence, which could be the statutory maximum for each count, would be determined by the Court after consideration of his advisory sentencing guidelines range and the other 18 U.S.C. § 3553(a) factors. Rhea's attorney confirmed that neither he (Mr. Barnes) nor Mr. Garza had made any representations to Rhea as to what sentence the Court might impose in the case. Rhea confirmed that he understood that the Court was not bound by any estimate his attorneys had given him as to his advisory guidelines range.

Based on defendant's responses at the change of plea hearing and the Court's observations of the defendant, the Court found that defendant was pleading guilty knowingly and voluntarily. Accordingly, Rhea was adjudged guilty of Count One (conspiracy to distribute oxycodone), Count Twelve (possession of firearms in furtherance of the drug trafficking offenses

charged in Counts One and Eleven), Count Fourteen (using and maintaining a residence for the purpose of distributing oxycodone), and Count Seventeen (conspiracy to distribute five grams or more of methamphetamine, a lesser included offense) of the superseding indictment. A presentence report ("PSR") was ordered and sentencing was scheduled for January 6, 2014. Sentencing was continued on the government's motion to March 10, 2014, because of the unavailability of the case agent, [Docs. 368, 371]. Rhea moved for a continuance of the March 10 date and sentencing was rescheduled for April 8, 2014, [Docs. 460, 462]. The PSR was disclosed on March 10, 2014, and Rhea moved, through counsel, to withdraw the guilty pleas pursuant to Rule 11(d)(1) because the Court had not accepted the pleas, [Doc. 491]. The motion was denied because the Court had accepted the guilty pleas on September 10, 2013, [Doc. 492]. On April 3, 2014, Rhea's attorneys moved to withdraw, [Doc. 502], and Rhea filed *pro se* motions to appoint counsel, to dismiss, and to withdraw his guilty pleas on April 9, 2014, [Docs. 504, 505, 506]. CJA counsel was appointed to represent Rhea and counsel supplemented the motion to withdraw the pleas on July 10, 2014, [Doc. 531].

## II. Analysis

"A defendant does not have an absolute right to withdraw a guilty plea." *United States v. Ellis*, 470 F.3d 275, 281 (6th Cir. 2006) (citations omitted). Federal Rule of Criminal Procedure 11(d) provides the standard applicable here for withdrawal of a guilty plea: "A defendant may withdraw a plea of guilty . . . (2) after the court accepts the plea, but before it imposes sentence if: . . . (B) the defendant can show a fair and just reason for requesting the withdrawal." Fed. R. Crim. P. 11(d)(2)(B).

Because the Court has already accepted defendant's guilty pleas, the defendant must

8

show a "fair and just reason" in order to withdraw his guilty pleas under Federal Rule of Criminal Procedure 11(d)(2)(B). This rule is designed "to allow a hastily entered plea made with unsure heart and confused mind to be undone, not to allow a defendant 'to make a tactical decision to enter a plea, wait several weeks, and then obtain a withdrawal if he believes that he made a bad choice in pleading guilty.'" *United States v. Alexander*, 948 F.2d 1002, 1004 (6th Cir. 1991), *cert. denied*, 502 U.S. 1117 (1992) (citation omitted).

The defendant carries the burden of proving that withdrawal of his guilty plea is justified, and the matter is left to the discretion of the district court. *United States v. Catchings*, 708 F.3d 710, 717 (6th Cir. 2013). In *United States v. Bashara*, the Sixth Circuit set forth a non-exclusive list of factors which should guide a district court in determining whether to allow a defendant to withdraw his guilty plea: (1) The amount of time that elapsed between the plea and the motion to withdraw it; (2) the presence or absence of a valid reason for the failure to move for withdrawal earlier in the proceeding; (3) whether the defendant has asserted or maintained his innocence; (4) the circumstances underlying the entry of the guilty plea; (5) the defendant's nature and background; (6) the degree to which the defendant has prior experience with the criminal justice system; and (7) potential prejudice to the government if the motion to withdraw is granted. 27 F.3d 1174, 1181 (6th Cir. 1994), *cert. denied*, 514 U.S. 1033 (1995), *superseded by Guidelines on other grounds*; *see* USSG § 3B1.1. "[T]he government is not required to establish prejudice that would result from a plea withdrawal, unless and until the defendant advances and establishes a fair and just reason for allowing the withdrawal." *United States v. Goddard*, 638 F.3d 490, 495 (6th Cir. 2011) (quoting *United States v. Spencer*, 836 F.2d 236, 240 (6th Cir. 1987)).

9

The Court will analyze each of the factors set forth in *Bashara* to determine whether the defendant has demonstrated a fair and just reason for withdrawal of his guilty pleas as required by Federal Rule of Criminal Procedure 11(d)(2)(B) and whether withdrawal is warranted after balancing any fair and just reason and any prejudice to the government.

### A. The Amount of Time That Elapsed

The first factor is the amount of time that elapsed between the pleas and the motion to withdraw them. Defendant signed a plea agreement on August 13, 2013, an addendum on September 10, 2013, after the return of the superseding indictment, and entered his guilty pleas on the same day. His first motion to withdraw his pleas was filed by his attorneys on March 13, 2014, three days after disclosure of the PSR.[1] Thus, a total of 214 days elapsed between the guilty pleas and the first motion to withdraw the pleas.

The Sixth Circuit has denied motions to withdraw guilty pleas on the basis of delays far shorter than the delay in this case. *See e.g., United States v. Durham*, 178 F.3d 796, 798-99 (6th Cir. 1998) (77 day delay); *United States v. Baez*, 87 F.3d 805, 808 (6th Cir. 1996), *cert. denied* 519 U.S. 973 (1996) (67 day delay); *United States v. Goldberg*, 862 F.2d 101, 104 (6th Cir. 1988) (55 day delay); *Spencer*, 836 F.2d at 239 (35 day delay). Specifically, the Sixth Circuit has held that an unjustified 75-day delay alone would support denial of the motion to withdraw. *United States v. Valdez*, 362 F.3d 903, 912 (6th Cir. 2004). This factor weighs strongly against withdraw, absent a determination that the delay was justified.

### B. Reason For Delay

---

[1] In the PSR, the probation officer concluded that defendant's advisory guidelines range is 324 to 405 months of imprisonment and a 60 month mandatory consecutive sentence as to Count Twelve, for a total advisory guidelines range of 384 to 465 months. Neither the government nor Rhea has filed any objections to the PSR but the Court has not yet adopted it.

The next factor for the Court to consider is whether any delay in defendant's filing of a motion to withdraw his guilty pleas is justified. Rhea offers no explanation for such a substantial delay in moving to withdraw his guilty pleas. As discussed below, defendant largely relies on claims of ineffective assistance and misadvice of counsel as a basis for his motion. Except for one of the proffered reasons, defendant was fully aware of each potential ground at the time of the entry of the pleas. He did not make the Court aware of any of the alleged shortcomings of counsel at the time of the change of plea hearing[2] nor at any time thereafter until the *pro se* motion to withdraw was filed. There was no impediment to defendant's earlier filing which would excuse the delay in the filing of his motion. The most likely and plausible explanation for the delay is that Rhea was unhappy with the PSR prepared by the probation office, especially the calculation of his advisory guidelines range, 384 to 465 months' imprisonment. Even if his attorney miscalculated the guidelines range,[3] that is not a "fair and just reason" for withdrawal of the guilty plea. *United States v. Stevens*, 906 F.2d 251, 253 (6th Cir. 1990). The Court made it clear to the defendant at the change of plea hearing that his sentence would be determined by the Court, that the sentencing guidelines were advisory, that the Court would decide the ultimate sentence, which could be a life term of imprisonment, and that counsel's estimate of the advisory guidelines range was not binding on the Court. This factor weighs against withdrawal of the pleas.

## C. Assertion of Innocence

The third factor is whether the defendant has asserted or maintained his innocence. Courts have taken into account the absence of a defendant's vigorous and repeated

---

[2]  In fact, Rhea stated under oath at the change of plea hearing that he was satisfied with his lawyers' representation of him.
[3]  Rhea does not appear to claim that his attorneys miscalculated the applicable guidelines range.

11

protestations of innocence. *Alexander,* 948 F.2d at 1004 (citing *United States v. Saft*, 558 F.2d 1073 (2d Cir. 1977)).

At the change of plea hearing on September 10, 2013, defendant was unequivocal in his pleas of guilty and his admission of facts which established, beyond a reasonable doubt, that he is guilty of all of the offenses to which he entered guilty pleas. The defendant never made an unequivocal protestation of innocence until the day of the evidentiary hearing, and then only as to the firearm and methamphetamine counts (Counts Twelve and Seventeen). He made no assertion of innocence in his *pro se* motion nor in his supplemental motion filed by counsel, only arguing that he would not have pled guilty to the possession of a firearm in furtherance of a drug trafficking offense but for his attorneys' advice. In counsel's supplement, she asserts that defendant might "have gone to trial on one or more of the charges," while pleading guilty to others. Counsel concedes, however, as to the firearm count, "that a conviction on the firearm [sic] might be *likely*," but "it is *possible* that at least one or more jurors could reasonably find that defendant's admitted possession of the firearms was not 'in furtherance of' the drug trafficking activity." [Doc. 531-1 at 2-3] (emphasis added).

At the hearing on the motion, defendant did assert that he was not guilty of the methamphetamine charge, (because he was confused about what "distribution" meant) and suggested that he did not possess the firearms in furtherance of the drug trafficking offenses but rather for some other purpose. Rhea testified that he had inherited all but seven of the firearms, kept them under his mattress, and had never fired any of the firearms. He acknowledged dealing drugs since 2010, but denied distribution of all but about 700 (out of the total of nearly 6,000) of the pills he obtained. He denied organizing trips by others to pain clinics in Florida. These weak

12

assertions of innocence are not "the vigorous and repeated protestations of innocence that would support a motion to withdraw guilty plea." *United States v. Dixon*, 479 F.3d 431, 437 (6th Cir. 2007) (quoting *Baez*, 87 F.3d at 809). This factor weighs against withdrawal.

### D. Circumstances Underlying the Entry of the Guilty Pleas

The circumstances underlying the entry of the guilty pleas is the next factor the Court must consider. The defendant argues that counsel representing him at that time made affirmative misrepresentations and failed to properly explain the legal ramifications of certain provisions of the plea agreement so as to render his guilty pleas unknowing and involuntary. Rhea's complaints about counsel, as set out in his supplemental motion are: (1) counsel assured him that he would get a government motion for downward departure and was likely to get a ten year sentence; (2) counsel never went over the specific provisions of the plea agreement with him and never explained the legal meaning of terms or the ramifications of certain provisions; (3) he was pressured by counsel to agree to an incorrect drug quantity and was not told he could plead guilty to the drug charges and submit the case to the jury for a determination of quantity; (4) he was pressured to plead guilty to the firearms count; (5) counsel did not discuss the law or any defenses; (6) counsel did not explain the money judgment; (7) counsel did not explain and discuss the appeal waivers with him; (8) counsel did not inform him of the option of pleading guilty to some charges and going to trial on others; and (9) counsel told him to say "yes" to all the Court's questions at the change of plea hearing.

A guilty plea is invalid if it is not entered knowingly, voluntarily and intelligently by the defendant. *Dixon*, 479 F.3d at 435 (citing *Brady v. United States*, 397 U.S. 742, 748 (1970)). "[B]ecause a guilty plea is an admission of all the elements of a formal criminal charge

13

it cannot be truly voluntary unless the defendant possesses an understanding of the law in relation to the facts." *United States v. McCreary-Redd*, 475 F.3d 718, 723 (6th Cir. 2007) (citations omitted). For a guilty plea to be valid, the district court must make sure that the defendant understands "any maximum possible penalty, including imprisonment, fine, and term of supervised release." Fed. R. Crim. P. 11(b)(1)(H).

Misadvice of counsel may be a sufficient basis for permitting the withdrawal of the guilty plea. *See Brown v. Perani*, 718 F.2d 784, 789 (6th Cir. 1983). "'[A]ffirmative misstatements of the maximum possible sentence' are sufficient to invalidate a guilty plea if the misstatements are material to defendant's decision to pled guilty." *Dixon*, 479 F.3d at 435 (quoting *Pitts v. United States*, 763 F.2d 197, 201 (6th Cir. 1985)); *see also Pitts*, 763 F.2d at 201 (reciting numerous cases finding that withdrawal of defendant's plea was appropriate in light of counsel's misadvice concerning sentence exposure, both when counsel overstated and understated defendant's possible sentence).

Rhea testified at the September 3 hearing about his contact with his attorneys and their investigator early on in the case. At some point, Rhea was provided with a proposed plea agreement by the investigator. One of his attorneys, John Barnes ("Barnes"), then came to discuss the plea agreement with Rhea. Rhea was not interested in the offer and rejected it. He kept the draft plea agreement, however, marked out and changed various portions of the proposal, and his second attorney, Marcos Garza ("Garza"), submitted the marked up document to the AUSA as a counter-proposal. Garza told Rhea the government would not accept the counter-proposal. The marked up agreement has now been filed as document 543 (sealed).

Garza told Rhea that the government would file a superseding indictment if he did

14

not plead guilty.[4]  Garza also told him he could get sixty (60) years on the gun charges alone if he went to trial and was convicted.[5]  Rhea asked his attorneys about the provisions in the plea agreement that provided for a $1.2 million money judgment against him.  According to Rhea, he was told not to worry and that he would not have to pay the money judgment.  Rhea says that his attorneys never went over the terms of the plea agreement with him and that he expressed that he did not want to sign the plea agreement.  Rhea did inquire about the drug quantity in the stipulated facts and was told that quantity was a sentencing factor that could be argued at sentencing.

Rhea testified that the investigator told him he had a good defense to the machinegun count because the weapon was sold as a non-automatic weapon and that they might get an expert to testify.  He later talked with Barnes, however, who told him that he could not find such a defense.  Rhea testified that Barnes and Garza told him he would probably get 10-12 years of imprisonment if he agreed to plead guilty and cooperated with the government.  He was told that all he had to do to get a motion for downward departure pursuant to USSG § 5K1.1 was to tell the government what he had done.

Barnes brought the plea agreement to Rhea for signature.  Rhea expressed that he "didn't know if it was the right thing to do."  Rhea testified that Barnes, who appeared with him for the change of plea hearing, told him to just say "yes" in response to the judge's questions at the change of plea hearing.  On questioning from the Court, Rhea modified this to "yes" or "no".  According to Rhea, he talked with Barnes and/or Garza about the forfeiture provisions of the

---

[4]  This was a true statement.
[5]  The superseding indictment charged three violations of 18 U.S.C. § 924(c):  A first conviction carries a five year mandatory minimum sentence, a second conviction carries a 25-year mandatory minimum, and a conviction involving a machinegun carries a 30-year mandatory minimum.

plea agreement and was told he was just signing away his right in the Hayter Drive house and that the government couldn't take his mother's interest.[6] Sometime later, Rhea talked to Barnes and Garza by telephone about his dissatisfaction with the plea agreement and was told he had three options: (1) seek to withdraw his pleas; (2) fire his attorneys, or (3) go forward to sentencing. Rhea instructed Garza to file a motion to withdraw (presumably the motion filed on March 13, 2014).

Rhea testified that he thought he understood the plea agreement before he signed it and entered his guilty pleas but didn't really because "nothing has happened the way [he] thought it would." After the Court permitted Garza and Barnes to withdraw, the Court appointed Louis Ricker to represent Rhea. Rhea testified that Ricker went over the plea agreement with him and he was told by Ricker for the first time that he could be required to pay the money judgment. He also testified that the first time he discussed or was aware of the appellate waivers was during Ricker's review of the plea agreement with him. Rhea further claims he was confused about the meaning of "distribution" with respect to the methamphetamine conspiracy charge and that no one ever explained the meaning of "in furtherance of" with respect to the firearm charge.

Both of Rhea's attorneys testified at the September 3 hearing. Barnes, who was employed by Garza at the time, did research on the case, reviewed discovery, and drafted pleadings. Garza negotiated the plea agreement. Barnes was present when Rhea signed the plea agreement and during a lengthy two hour meeting during which the agreement was discussed in

---

[6] According to Rhea, Garza and Barnes were hired by his mother and sister to represent him. Rhea's sister confirmed Rhea's testimony that Garza was also hired to protect his mother's interest in the Hayter Drive house and charged an extra $10,000 for that service. Rhea's sister, however, testified that the full fee had never been paid to Garza and Barnes.

detail with Rhea. Barnes believed Rhea understood the agreement. Rhea had had lots of questions prior to signing the agreement and had previously marked up the first draft with revisions he would accept. These revisions had been rejected by the AUSA.

Barnes prepared a legal memorandum on the law relating to the gun charges and reviewed it with Rhea before the change of plea. They discussed possible defenses and the quantity of drugs stipulated to, an amount Rhea thought was too high. Barnes never heard Garza tell Rhea the quantity was something they could argue about at sentencing. Barnes recalled no conversation about the money judgment but did not tell Rhea he would not have to pay it. They discussed the requirements of Rhea's cooperation agreement and the possibility that Rhea might be testifying against one co-defendant who was going to trial. The attorneys never "guaranteed" the filing of a § 5K1.1 motion but thought it likely based on information provided to them by Rhea. Barnes attended Rhea's debriefing by the government but Rhea's proffer was inconsistent with the information he had previously provided to his attorneys. The AUSA and case agent became frustrated with Rhea and Barnes left the debriefing believing no § 5K1.1 motion would be filed. Barnes recalled no conversations where he told Rhea to just say "yes" in response to the Court's questions at the change of plea hearing, although he may have done so with respect to specific questions if the answer was consistent with what Rhea had told him before. Barnes would never have allowed Rhea to say something he believed was false.

Garza's testimony was consistent with that of Barnes. Garza negotiated the plea agreement with AUSA Suzanne Kerney-Quillen. He presented the draft proposal to Rhea. Rhea marked up the draft agreement and it was presented to the AUSA, although Garza knew some of the changes were very likely to be rejected and he even feared the proposed plea agreement

17

might be withdrawn by the government. Garza reviewed the plea agreement with Rhea multiple times. Just prior to the change of plea hearing, they went through the agreement "page by page." Garza's standard practice was to discuss both the appellate waivers and any money judgment with the defendant. He never told Rhea not to worry about the money judgment or that he would not have to pay it. Garza believed he had answered all of Rhea's questions and that Rhea understood the agreement. Rhea was "reticent" about signing the plea agreement and thought what he had done might get him a year or two in state court. Garza talked with Rhea about the possibility of a § 5K1.1 motion and told him it could make a tremendous difference in his sentence. Garza talked to Rhea about pleading guilty to some charges and taking others to trial.

Garza described Rhea as a smart, confident person who believed he could outsmart others. He testified that he did not pressure Rhea to accept the offered plea agreement but did tell Rhea and his family that he thought it was a good deal and would give Rhea a chance to see his kids and grandchildren again. He told Rhea's family that, if Rhea were a relative of his, he would encourage him to accept the government's offer because the risk of not doing so was "extraordinary."

The Court will discuss each of defendant's allegations of ineffective assistance of counsel in turn. Before doing so, however, the Court will address one issue that permeates each claim. Rhea's sworn testimony at the September 3 hearing directly contradicts his sworn testimony at the change of plea hearing. He claims, however, that he did not knowingly lie at the change of plea hearing but rather was confused and without understanding of the terms of his plea agreement and/or acting at the direction of his attorneys to simply answer "yes." Generally speaking, where the Court follows the requirements of Rule 11, as it did here, "the defendant is

bound by his statements in response to the Court's inquiry." *Baker v. United States*, 781 F.2d 85, 90 (6th Cir. 1986) (quoting *Moore v. Estelle*, 526 F.2d 690, 696-97 (5th Cir. 1976)). To find otherwise would make every plea subject to attack and render the oral responses given in court meaningless. *Warner v. United States*, 975 F.2d 1207, 1212 (6th Cir. 1992). This Court conducted a proper, clear, and thorough plea colloquy. A trial court's "thorough examination at the hearing, taking careful and appropriate measures to dispel any confusion on [the defendant's] part before the plea was accepted" cures any claim that the defendant was prejudiced by erroneous "advice from [the defendant's] trial attorney [that allegedly] led to [his] misunderstanding of the consequences of [his] guilty plea." *Barker v. United States* 7 F.3d 629, 633 (6th Cir. 1993) *cert. denied*, 510 U.S. 1099 (1994).

The defendant's testimony also differed in many material respects from that of his attorneys. Rhea's attorneys are experienced, capable attorneys and the Court found their testimony consistent and credible. To the extent the Court must resolve questions of credibility, Garza and Barnes are believed and Rhea is not. Rhea's claim of lack of understanding of certain provisions of the plea agreement or the Court's questions at the change of plea hearing are simply not credible based on other evidence in the record, his claims of intellectual limitations and the need for Paxil or Xanax for him to focus and concentrate notwithstanding. Rhea confirmed at the change of plea hearing that he had a high school diploma and could read and understand what he read. His attorney described him as "smart" and "confident" and someone who feels he can outsmart others, descriptions which are consistent with the Court's own observations of Rhea. This conclusion is underscored by the "marked-up" draft plea agreement which was modified by Rhea and provided to the United States Attorney's office as a counter-

proposal. That document was edited significantly by Rhea without assistance and in his own hand. Each page of the document has Rhea's signature, including pages with the provisions he now claims no knowledge of. This document, [Doc. 543], convinces the Court that Rhea was well informed and fully engaged in his defense of the case and knew exactly what he was doing.

## 1. Assurance of Ten Year Sentence

Defendant's claims that his guilty pleas were unknowing and involuntary because his attorneys assured him that he would receive a sentence of 10-12 years[7] if he pleaded guilty. This claim is flatly contradicted by the record. First of all, the draft plea agreement presented to Rhea clearly stated that:

> . . . any estimates or predictions made by the defense counsel or any other person regarding any potential sentence in this case are not binding on the Court, and may not be used as a basis to rescind this plea agreement or withdraw the defendant's guilty pleas. The defendant understands that the sentence in his case will be determined by the Court after it receives the presentence from the United States Probation Office and any information presented by the parties. The defendant acknowledges that the sentencing determination will be based upon the entire scope of the defendant's criminal conduct, the defendant's criminal history, and pursuant to other factors and guidelines as set forth in the Sentencing Guidelines and the factors set forth in 18 U.S.C. § 3553.

[Doc. 543 at ¶ 6(c)]. Identical language was carried forward into the plea agreement actually signed by Rhea, [Doc. 296 at ¶ 6(c)].

Rhea made extensive changes to this draft plea agreement but made no changes to paragraph 6(c). He did, however, sign at the bottom of the page where the quoted language

---

[7]  Rhea testified at the September 3 hearing that he was told by his attorneys that he would probably get 10-12 years if he signed the plea agreement. In the supplement to his motion to withdraw his guilty pleas, he states, through counsel, that his attorneys told him that he "would likely get some ten years off his sentence." Obviously, these are very different allegations.

20

appears. He furthermore testified unequivocally at the change of plea hearing that no promises of any kind had been made by anyone to induce him to plead guilty, [Doc. 494 at 17-18], and he acknowledged that he was aware of the maximum sentence which could be imposed as to each count, [*id.* at 23]. Rhea also acknowledged that he understood that the Court would consider his advisory guidelines range and the other § 3553(a) factors before deciding on an appropriate sentence, [*id.* at 30-32], and that the Court could impose a sentence "more severe than the sentence called for in the advisory guidelines." [*Id.* at 32].[8] Maybe most important of all, Rhea stood mutely by when Barnes told the Court that neither he nor Garza "had made any representations to Mr. Rhea as to what sentence the Court might impose in his case." [*Id.* at 33]. Rhea affirmatively acknowledged that any estimate by his attorneys as to the advisory guidelines range was simply an estimate and not binding on the Court. [*Id.*].

Rhea likewise asserts that his attorneys assured him that the government would file a motion for downward departure pursuant to § 5K1.1 of the guidelines. While the Court credits the testimony of Rhea's attorneys that they made no such assurance, the Court notes that Rhea did not dispute the testimony of Barnes that he believed it likely that a motion for downward departure would be filed if Rhea debriefed with the government consistent with what he had told his attorneys or that, on the day of the debriefing, Rhea left out information or provided the government information that was inconsistent with the information previously given to his attorneys. It is also obvious from the reaction of the case agent and the AUSA at

---

[8]  The Court did misstate the maximum sentence that could be imposed with respect to the methamphetamine conspiracy near the end of the colloquy when asking the defendant if he understood that a more severe sentence than the one indicated by his advisory guidelines range could be imposed and referred to a maximum of life imprisonment as to Count Twelve. Defendant had already been advised, however, that the maximum for Court Twelve was 20 years and he clearly does not assert that the Court's misstatement was in any way material to the entry of his guilty pleas. By that time in the colloquy, the defendant had already unequivocally entered his guilty pleas and admitted the stipulated facts.

that debriefing that Rhea was providing information which was inconsistent with other information the government had gathered in the case. The Court further does not credit any claim by Rhea that his attorneys led him to believe that the motion for downward departure would be filed if he simply told the government what he had done in the case. Section 5K1.1 provides for a substantial assistance motion if the defendant "has provided substantial assistance in the investigation or prosecution of another person who has committed an offense," USSG § 5K1.1, not simply admit his own involvement in the offense.

Defendant's argument also ignores the plea agreement supplement he signed on August 13, 2013. [Doc. 297]. Because the plea agreement supplement is sealed, however, the Court will not recite the language of the supplement in this order. Suffice it to say, however, that the terms of the supplement signed by Rhea clearly and forcefully contradict Rhea's claims.

These claims lack merit.

### 2. Failure of Counsel to Explain Provisions of the Plea Agreement

Rhea contends that counsel did not explain specific provisions of the plea agreement, the legal meaning of terms used, or the legal ramifications of various provisions in the agreement. Once again, the record clearly contradicts the claims. During the change of plea hearing on September 10, 2013, the defendant was asked very specific questions about his understanding of the terms of the agreement and his attorneys' explanation of those terms. He stated that he had read and signed the plea agreement and fully understood its terms and conditions:

> Q.      Alright. Mr. Rhea, have you read the plea agreement and the addendum to the plea agreement?
> A.      Yes.
> Q.      And has your attorney explained to you all the terms and

conditions of the agreement?
A.     Yes.
Q.     And do you fully understand all the terms and conditions of the agreement you've entered into with the United States?
A.     Yes.
Q.     And is this your signature on both this original plea agreement filed as document 296 and the addendum to the plea agreement which was just handed up to me?
A.     Yes.

[Doc. 494 at 14]. In addition, Rhea was queried about whether or not his attorneys had explained the meaning of certain words used in the indictment. Rhea testified that his attorneys had explained to him the meaning of all words used in the superseding indictment about which he had any question. [Doc. 494 at 6]. Furthermore, defendant's revisions to the draft plea agreement clearly illustrate that Rhea had read the agreement carefully and understood the agreement well enough to modify certain language and remove other language altogether. In addition, Barnes and Garza unequivocally testified that they spent considerable time going over the provisions of the agreement with Rhea. Both believed he understood the terms of the agreement. Their testimony is fully credible.

Rhea testified that he had a special education high school diploma and needed Paxil or Xanax to help him focus, medication he was not taking at the time of the change of plea hearing. Although not clearly stated, Rhea apparently suggests that his intellectual limitations and lack of appropriate medication on the day of the change of plea hearing somehow made his pleas unknowing and involuntary. Rhea, however, did not disclose to the Court that his high school diploma was a special education diploma, stated unequivocally that he understood the nature of the change of plea proceeding, and confirmed that there was nothing "about [his] mental or physical condition which would make it difficult for [him] to understand the[ ]

23

proceedings, to think clearly or to make good decisions about [his] own case." [*Id*. at 4]. Indeed, the Court's own observations confirmed as much. At two points in the proceeding, the Court explained questions further for Rhea when he exhibited some uncertainty. When Rhea was asked whether he had discussed possible defenses with his attorneys, he answered "I'm not sure." After further explanation, Rhea answered "yes." [*Id*. at 11]. At another point in the proceeding, Rhea was asked by the Court whether he knew he was giving up his right not to incriminate himself. He answered "yes," but the Court observed a "puzzled look" about Rhea. The Court clarified the question and Rhea answered "yes" and the Court, satisfied that he understood, moved on to the next question. [*Id*. at 17]. Not only do these incidents increase the confidence of the Court that Rhea understood the Court's questions and was willing to seek clarification if he did not, they belie his claim that he was just rotely answering "yes" to the Court's questions at his attorneys' direction.

Not only does Rhea generally allege that his attorneys did not explain, and he did not understand, the terms of the plea agreement and/or some of the relevant legal terms, he singles out certain provisions of the plea agreement and specific legal terms or phrases and the Court will address them briefly separately.

### a. The Money Judgment

Rhea claims that his attorneys affirmatively misled him with respect to the provision in his plea agreement that he be responsible for a money judgment in the amount of $1,200,000, representing the proceeds of oxycodone and methamphetamine for which he admitted responsibility. Rhea now claims that he was told by his attorneys "you don't have to worry about that," that he would not have to pay the money judgment, and that he would only be

24

responsible for a $100.00 fine.  Aside and apart from any credibility issues here, the Court's explanation of the money judgment provisions at the change of plea hearing cured any prejudice Rhea might have suffered from such allegedly erroneous advice.

The provisions related to the money judgment are contained in paragraph 9(c) of the plea agreement by reference to paragraph 4(s)[9] of the agreement which provides that Rhea is responsible for a money judgment of $1,200,000.  The Court clearly informed Rhea of the provision that he would be responsible for a money judgment and confirmed his understanding that the Court would enter such a judgment in favor of the United States.

> Q.    And in addition, do you understand that pursuant to paragraph 9 and paragraph 4(t) of this plea agreement, you have further agreed that **you will be responsible for** a money judgment in the amount of $1,200,000, which represents the proceeds of oxycodone and methamphetamine for which you admit responsibility in this case?
> A.    Yes.
> Q.    In other words, do you understand that as part of the judgment in this case this Court will enter a money judgment against you in favor of the United States in the amount of $1,200,000?
> A.    Yes.

[Doc. 494 at 27].  Rhea expressed absolutely no lack of understanding about these provisions of his plea agreement.

With respect to Rhea's claim that he would only be responsible for a $100.00 fine, that claim too is flatly contradicted by the record.  Rhea was clearly and unequivocally advised of the potential fines with respect to each count of the superseding indictment to which he was pleading guilty.  As to Count One, Rhea was advised that he faced "a fine of up to $1 million," [*id*. at 22]; as to Count Twelve, "a fine of up to $250,000," [*id*.]; as to Count Fourteen "a fine of

---

[9]   The actual paragraph in the plea agreement is 4(t) and the Court referred to it correctly at the change of plea hearing, [*see* Doc. 494 at 27, l. 7].

up to $500,000," [*id.*]; and as to Count Seventeen "a fine of up to $5 million." [*Id.* at 23]. Rhea was also advised that there would be a mandatory assessment of $100.00 as to each count. Rhea unequivocally acknowledged that he understood these maximum fines. Furthermore, Rhea's plea agreement provided that "the Court may impose . . . any lawful fines." [Doc. 246 at ¶ 6(a)]. Just as importantly, the marked up plea agreement, [Doc. 543], clearly indicates that Rhea reviewed the penalty provisions of the plea agreement as to all counts of the indictment and indeed struck from the agreement those provisions as they related to the firearms and methamphetamine conspiracy charges. Rhea also struck from the draft plea agreement the provisions related to the money judgment, once again indicating that he was clearly aware of those provisions in the agreement. This claim lacks merit.

### b. Appellate Waivers

Rhea's plea agreement contained waivers of rights to direct appeal or to collaterally attack his convictions or sentence pursuant to 28 U.S.C. § 2255, [Doc. 296, ¶ 11]. Rhea claims that his attorneys did not discuss with him at all the provision in the plea agreement containing the waiver of his rights to appeal and simply "recalls reading a provision about appeal in the Plea Agreement and that the court said something about it at the entry of his plea." Rhea claims he did not fully understand the provision, however, until Mr. Ricker took over his case and explained the provisions to him. Once again, Rhea's claims are flatly contradicted by the record. Those waiver provisions are clearly set out in both the draft plea agreement marked up by Rhea and the plea agreement filed with the Court which he read and signed. More importantly, the transcript of the change of plea hearing contradicts Rhea's claim. At that hearing, the AUSA read the waivers into the record and referenced the provisions by paragraph

26

and page numbers of the plea agreement. After the waivers were read into the record, the Court had the following exchange with Rhea:

> Q. Mr. Rhea, do you understand that under your plea agreement with the government you have expressly waived rights to appeal or to collaterally attack your convictions or the sentence imposed in this case, as just stated by the United States Attorney and as set out in paragraph 11 of your plea agreement?
> A. Yes.
> Q. Did you read paragraph 11 of this plea agreement *carefully*?
> A. Yes.
> Q. *Did you review the provisions of paragraph 11 of the plea agreement carefully with your attorneys*?
> A. Yes.
> Q. Have you and your attorneys *fully discussed* these waivers of your rights to appeal and your right to collaterally attack your conviction or the resulting sentence in this case?
> A. I ain't sure I understand that.
> Q. I'm just asking if you have fully discussed all these waivers with your attorneys? In other words *have they explained them to you, have they answered all of yours questions about them, do you understand them?*
> A. Yes.

[Doc. 494 at 29-30] (emphasis added). Rhea simply cannot disavow his under oath statements at the change of plea hearing. This claim lacks merit.

### c. Meaning of Terms

#### i. Distribute

Rhea testified at the September 3 hearing that when he pled guilty to the charge of conspiracy to distribute methamphetamine, he was "confused" about what distribution meant. As used in Title 21 of the United States Code, [t]he term 'distribute' means to deliver (other than by administering or dispensing) a controlled substance or a listed chemical." 21 U.S.C. § 802(11). The term "distribution" has been defined broadly to include acts done in

27

furtherance of a transfer or sale of drugs. *See United States v. Colon*, 268 F.3d 367 (6th Cir. 2001). Understanding the term "distribution" does not require any special learning or expertise; the word's meaning is commonly understood. It is inconceivable to the Court that Rhea could have been confused about the meaning of the term. First of all, both Counts One and Fourteen of the superseding indictment, counts which Rhea has pled guilty to, also contain elements using the term distribute or distribution. Rhea does not assert any confusion about the meaning of the term in the context of those counts. In fact, the meaning of distribute as it relates to Count One has the very same meaning that it has as it relates to Count Seventeen. It is simply not credible to believe that Rhea was confused about the meaning of the term distribution with respect to Count Seventeen when he expresses no similar confusion about Count One. Indeed, Rhea continues to maintain that he is guilty of Count One and would have pled guilty to Count One in any event. Furthermore, his understanding of the term is clearly established by the "marked-up" draft plea agreement. At numerous places throughout the plea agreement, Rhea has stricken through the term "distribute" and replaced it with other terms such as "possession" or "using." Rhea's own handwritten changes in the draft plea agreement leave no doubt that he understood the meaning of the term "distribution."

### ii. "In Furtherance Of"

Rhea asserted at the September 3 hearing that no one, including counsel, ever told him what was required to prove "in furtherance of" with respect to the firearm count. Once again, Rhea's assertion is flatly contradicted by the record. At the change of plea hearing on September 10, 2013, the Court not only read Count Twelve of the superseding indictment to Rhea verbatim and explained to him the elements of the offense, the Court specifically called

28

Rhea's attention to the use of the term "in furtherance of" and explained its meaning. Rhea affirmatively stated that he understood what was required to prove "in furtherance of."

> Q. Now, I've used some terms here, let me make sure that you understand the use of these terms. In particular I have referred to the phrase "in furtherance of." Do you understand that the term "in furtherance of" means that the firearm or firearms was possessed to advance or promote the crimes charges in counts 1 and/or 11 and that the firearms were strategically located so that they were quickly and easily available for use?
> A. Yes.

[Doc. 494 at 10]. The Court's explanation of the meaning of the phrase and Rhea's answer to the Court's question were clear, succinct, and left little room for confusion. Rhea never expressed any confusion about the meaning of the phrase nor did he ever suggest to the Court that his attorneys had not discussed what was required to prove "in furtherance of." Rhea's answer on September 10, 2013, clearly establishes that his claim that he was never told what was required to prove "in furtherance of" is not credible.

### E. Pressure From Counsel

Rhea also asserts that his plea was unknowing and involuntary because he was pressured by counsel to agree to an incorrect drug quantity and to plead guilty to the firearms count. Rhea argues that he always objected to the plea agreement's provisions with respect to the quantity of drugs for which he was responsible, did not conspire to distribute nearly as many oxycodone pills as the plea agreement states, and suggests he would not have pled guilty to Count One but for his counsel's representation that the quantity could be litigated at sentencing. Rhea gave very few details during his testimony at the September 3 hearing about the kind of pressure he alleges from his attorneys. Rhea simply testified that his attorneys indicated to him that unless he took the offered plea agreement, the government would seek to supersede the indictment and that he

29

could receive 60 years upon conviction of the firearm counts alone, making the risk to him "extraordinary." Counsel acknowledged their concern about the gun counts and acknowledged that they had expressed to the defendant and his family that they believed it to be in his best interest to accept the government's offer. Giving such advice is exactly what good lawyers do. That does not amount, however, to pressure which overcomes a defendant's knowing and voluntary acceptance of a plea agreement and entry of guilty pleas. The record in this case confirms as much. Rhea was specifically asked by the Court during the change of plea hearing whether "any person, including an officer or agent of the government, put any pressure" on him to force him to plead guilty in the case. His answer was an unequivocal "no". He also confirmed, again unequivocally, that no promises or threats of any kind had been made to induce him to plead guilty in the case. [*Id.* at 17- 18].

Furthermore, although the defendant may have been unhappy with the factual stipulation with respect to drug quantity and may not have wanted to plead guilty to the firearms count, he has established no pressure from anyone sufficient to overcome his own voluntary, intelligent decision to enter the pleas. The defendant entered into a lengthy stipulation of facts which was incorporated into his plea agreement for the purpose of establishing a factual basis for his guilty pleas. The Court very carefully questioned Rhea about his understanding of and agreement with the factual stipulation. Rhea acknowledged that he had read the factual stipulation carefully, that he had reviewed the stipulation of facts carefully with his attorneys, that he agreed with the summary of what he did in the case set out in the stipulation, and confirmed under oath that those facts were true and correct. [*Id*. at 19-20]. Rhea's answers were not hesitant, nor did he exhibit any confusion or lack of understanding. He is now bound by those responses.

30

Once again, the "marked-up" draft agreement also suggests that Rhea fully understood the stipulation he had entered into. In the draft agreement, Rhea made substantial changes to paragraph 4 of his plea agreement which contains the stipulation of facts. As noted above, Rhea made numerous deletions and changes to the stipulation including the quantity stipulation. It is completely disingenuous for this defendant to suggest, given his thorough review of, and revisions to, the stipulation of facts in the draft plea agreement, that he did not understand the contents of the stipulation or that the stipulation was incorrect. Finally, although Rhea is not clear about how he was pressured to plead guilty to the firearm count, to the extent he alleges that he was presented with a "take it or leave it" choice, that does not mean his choice to "take it" was unknowing or involuntary. This claim also lacks merit.

**F.    Option of Pleading Guilty to Some Charges But Going to Trial on Others**

The defendant also argues that his guilty plea was unknowing and involuntary because his attorneys did not advise him that he could plead guilty to some charges and go to trial on others. Rhea specifically claims that he was not told he could plead guilty to the drug charges and submit the case to the jury for a determination of quantity. These claims also lack any merit. First of all, the defendant was clearly advised at the change of plea hearing that he had a right to plead not guilty to any charge against him and that he would then be entitled to a jury trial. He acknowledged his understanding. Secondly, Rhea does not identify which counts he would have pleaded guilty to, except for Count One.

**G.    Defendant's Nature and Background**

The next factor for the Court to consider is defendant's nature and background. Defendant's intelligence, sophistication, and understanding of the plea are relevant to the Court's

analysis of this factor.  *Ellis*, 470 F.3d at 285 (finding that this factor supported denial of defendant's motion to withdraw plea because defendant was highly educated and sophisticated and understood what he was doing when he entered his plea); *see also United States v. Quinlan*, 473 F.3d 273, 278 (6th Cir. 2007).

Rhea is a high school graduate with post-secondary training as a machinist at ITT Technical Institute in Rogersville, Tennessee.  He testified that he was a special education student in high school although no school records were provided by defendant nor received as a result of the probation officer's request.  No grade reports, test results or other information has been provided.  Rhea's attorney described him as "smart" and "confident," and that assessment is consistent with the Court's own observations.  Rhea was self- employed in his own landscaping business from 2009 to 2013.

The defendant reports a diagnosis of anxiety four to five years ago for which he was prescribed Xanax.  No medical records were produced.  Rhea has no other history of mental health treatment.  Although he reports that he was not taking the prescribed Xanax at the time of the plea and he is able to concentrate better when he is on the medication, he did not report that to the Court at the change of plea hearing.  Nothing in the record establishes any impaired mental capacity, intellectual deficits, or emotional problems sufficient to cause defendant to be confused or to be unable to understand the nature of the change of plea proceeding, his plea agreement or his entry of guilty pleas.  This factor does not support withdrawal and is, at best, a neutral factor.

### H.    Prior Experience With the Criminal Justice System

The Court must consider defendant's prior experience with the criminal justice system. With this factor, it is relevant whether the defendant is "a novice" to or "familiar with" the

criminal justice system. *Spencer*, 836 F.2d at 240 (quoting *United States v. Kirkland*, 578 F.2d 170, 171-72 (6th Cir. 1978)). In *United States v. Dixon* and *United States v. Durham*, the Sixth Circuit found that a defendant's one prior state conviction constituted enough experience with the criminal justice system to weigh against withdrawal. *Dixon*, 479 F.3d at 437; *Durham*, 178 F.3d at 799. But *see Ellis*, 470 F.3d at 285 & n.3 (finding that defendant's one state court conviction for a minor offense did not constitute extensive experience with the criminal justice system).

Defendant's record of experience with the criminal justice system is a mixed bag. He was convicted at age 17 of failure to yield for blue lights in the Hancock County General Sessions Court. At age 19, he was convicted for violation of a traffic control device in Hawkins County General Sessions Court. He received a speeding ticket for traveling 78 mph in a 55 mph zone and was found guilty at age 27 (2003). Rhea was found guilty of carrying a weapon and possession of drug paraphernalia in 2005 at the age of 29 in the Hawkins County Criminal Court. He received suspended sentences of 30 days and 11 months, 29 days imprisonment, except for 10 days, respectively and charges of possession of a controlled substance with intent to manufacture (a felony), domestic assault and vandalism were dismissed. Defendant's probation was later revoked and his sentence reinstated. Rhea has pending charges of felony reckless endangerment, felony evading arrest, speeding, violation of financial responsibility, and violation of registration law in the Hawkins County General Sessions Court. Rhea has been charged with more than a dozen speeding violations, theft offenses, domestic assaults, false arrest, criminal trespassing, evading arrest, and multiple violations of orders of protection.

Although his record of criminal convictions consists of only three misdemeanor traffic

33

violations and two more serious misdemeanor offenses, the Court would describe Rhea's overall experience with the criminal justice system to be extensive. He is clearly familiar with the criminal justice system, including the entry previously of a guilty plea. This factor weighs against withdrawal of the pleas.

## I. Prejudice to the Government

The Court has identified none of the *Bashara* factors which weigh in favor of withdrawal of the guilty pleas. The Court finds no just and fair reason for vacating the pleas; thus, the Court need not consider whether the government has established prejudice. In an abundance of caution, however, the Court finds that the government has shown potential prejudice if defendant's pleas are withdrawn.

Prejudice to the government can include wasted government resources, which in turn can include potential wasted judicial resources. *See United States v. Carr*, 740 F.2d 339, 345-46 (5th Cir. 1984), *cert. denied*, 471 U.S. 1004 (1985); *see also Durham*, 178 F.3d at 799 (noting that "forcing the government to prepare its case once again would prejudice the government").

Prejudice can also be shown if witnesses are no longer available or that the delay resulting from defendant's withdrawn guilty plea harms the witnesses' ability or incentive to testify truthfully and accurately. *Valdez*, 362 F.3d at 913; *United States v. Mise*, 27 Fed. App'x 408, 414 (2001) (finding prejudice to the government when cooperating defendants had already been sentenced and therefore did not have the same incentive to cooperate with the government). However, because the government always has to spend time and money trying a case, the time and expense of trial constitutes prejudice only when the government must spend extra time and expense preparing for trial as a result of defendant's decision to plead guilty and then withdraw

34

the plea. *See Valdez*, 362 F.3d at 913.

As the United States has noted, it has been approximately 23 months since defendant was indicted and approximately one year since the defendant entered his pleas of guilty. Rhea was the next to the last defendant in the case to enter guilty pleas and he did so only weeks before a scheduled trial and at a time when the government would have necessarily already begun its preparations for trial. In the interim, the other co-defendants in the conspiracy have been convicted and sentenced, with the exception of one co-defendant. Almost all of the co-defendants are now serving terms of imprisonment in the Bureau of Prisons' custody and have now lost any real incentive to cooperate with the government, making it much more difficult for the United States to obtain co-conspirators as potential witnesses. The increased cost to the government of preparing for trial now and obtaining the return of potential witnesses to this district would cause the government to incur extra time and expense which would otherwise have been unnecessary but for the defendant's decision to plead guilty and his subsequent attempt to withdraw the guilty pleas. The government would clearly be prejudiced if the Court were to grant this motion.

## III. Conclusion

For the reasons stated herein, defendant's motion to withdraw his guilty pleas, [Docs. 506, 531], is DENIED. In light of this ruling, sentencing is scheduled for October 27, 2014 at 1:30 p.m. Each party's sentencing memorandum shall be due on or before October 14, 2014.

So ordered.

ENTER:

s/ J. RONNIE GREER
_____
UNITED STATES DISTRICT JUDGE

35